IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:17-CR-208-WKW |
| | ) | |
| KEITH CHANNING REDDICK | ) | |

## **MEMORANDUM OPINION AND ORDER**

Defendant Keith Channing Reddick pled guilty to one count of receipt of child pornography in violation 18 U.S.C. § 2252(a)(2) and (b). He was sentenced on October 18, 2017. However, restitution remained open because of unresolved factual issues pertaining to the amount to be awarded for three identifiable victims: "Jan_Socks Sierra," "8 Kids – John Doe 4," and "Sweet Sugar – Ava."[1] The parties requested and were allowed an opportunity following the sentencing hearing to reach an agreement as to the appropriate amount of restitution for those victims. The parties reached an agreement that Defendant would pay restitution in the amount of $1,500.00 each to "8 Kids – John Doe 4" and "Sweet Sugar – Ava." However, because the parties could not resolve the matter of restitution for Sierra, the court held a restitution hearing on December 19, 2017. Sierra's attorney, Carol Hepburn, appeared at the hearing as a fact witness with personal knowledge regarding the extent of Sierra's injuries. Upon consideration of all the evidence and the record,

---

[1] To protect the privacy of these victims, the court will use their pseudonyms.

the court concludes that Defendant shall pay restitution to Sierra in the amount of $2,000.00.

## I. APPLICABLE LEGAL STANDARDS

"'A federal district court has 'no inherent authority to order restitution, and may do so only as explicitly empowered by statute.'" *United States v. Dickerson*, 370 F.3d 1330, 1335 (11th Cir. 2004) (quoting *United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996)). 18 U.S.C. § 2259 provides that the district court "shall" order restitution to identified victims of certain child pornography crimes, including receipt of child pornography. Under § 2259, a restitution order "shall direct the defendant to pay the victim . . . the full amount of the victim's losses as determined by the court." 18 U.S.C. § 2259(b)(1). "The full amount of the victim's losses" includes any costs the victim incurred for

> (A) medical services relating to physical, psychiatric, or psychological care;
> (B) physical and occupational therapy or rehabilitation;
> (C) necessary transportation, temporary housing, and child care expenses;
> (D) lost income;
> (E) attorneys' fees, as well as other costs incurred; and
> (F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3).

In *Paroline v. United States*, 134 S. Ct. 1710 (2014), the Supreme Court held that "[r]estitution is . . . proper under § 2259 only to the extent the defendant's

2

offense proximately caused a victim's losses." 134 S.Ct. at 1722. Thus, in child pornography cases,

> where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images[,] but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id.* at 1727.

The Supreme Court suggested the following "rough guideposts for determining an amount that fits the offense":

> [D]istrict courts might, as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images . . . , then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses. These could include the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.

*Id.* at 1728.

Thus, "[a]t a general level of abstraction," under *Paroline*, "a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id.* at 1727-28. As the Supreme Court acknowledged, though, at the real-world level of determining restitution amounts in specific cases, *Paroline's* "rough" guidance is "not without its difficulties." *Id.* at 1729; *see United States v. DiLeo*, 58 F. Supp. 3d 239, 244-45 (E.D.N.Y. 2014) (noting the inherent impossibility of estimating a number of crucial *Paroline* factors and observing that the task of crafting a restitution order in accordance with *Paroline* "seems akin to piloting a small craft to safe harbor in a Nor'easter"). Nevertheless, the *Paroline* Court declined to offer "further detailed guidance" for practical application, instead entrusting the experienced "discretion and sound judgment" of district courts to work out the remaining practical problems inherent in fashioning restitution orders under § 2259 and *Paroline*. 134 S. Ct. at 1728-29. Under *Paroline* and § 2259, "courts can only do their best to apply the statute as written in a workable manner" while remaining "faithful to the competing principles at stake: that victims should be compensated and that defendants should be held to account for the impact of their conduct on those victims, but also that defendants should be made liable for the consequences and gravity of their own conduct, not the conduct of others." 134 S. Ct. at 1729.

Section 2259 provides that "[a]n order of restitution . . . shall be issued and enforced in accordance with [18 U.S.C. §] 3664 in the same manner as an order under [18 U.S.C. §] 3663A." 18 U.S.C. § 2259(b)(2). Section 3664(e) provides that the attorney for the Government bears the burden of demonstrating, by a preponderance of the evidence, "the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e).

## II. ANALYSIS

### A. The Total Amount of Sierra's Losses Caused by Trafficking in Pornographic Images

*Paroline's* starting point for fashioning a restitution award is an estimation of the amount of the victim's losses caused by continuing traffic in the victim's images. *Paroline*, 134 S.Ct. at 1728. The court will "do [its] best," *id.* at 1729, and will consider the record and each of the categories of costs listed in § 2259(b)(3) to arrive at a reasonable, non-speculative estimate of Sierra's total lifetime losses from all trafficking. However, determining the total amount of Sierra's losses due to all continuing traffic is particularly difficult because Sierra is still a minor, the production of the last of the pornographic material was relatively recent, and she is still in the early stages of a process of recovery that will span the course of her lifetime. Therefore, the estimate would necessarily require revision and refinement

in future cases as circumstances unfold that more clearly indicate the extent of Sierra's losses over the course of her lifetime.[2]

### 1. Medical Services Relating to Physical, Psychiatric, or Psychological Care

Reports from two experts provide a reliable starting point for estimating Sierra's ongoing medical costs. First, in a report dated May 4, 2016, Dr. Sharon W. Cooper, M.D., a developmental and forensic pediatrician, provided the following estimates of Sierra's projected medical costs:

- general health care to age 64:[3] $70,000
- medication and medical care for insomnia: $128,128
- other medications:[4] $456,762
- two emergency department visits before age 22: $4,136
- two 4-day inpatient hospital stays before age 22: $2,427

total: $ 661,453

---

[2] Clinical psychologist Dr. Randall Green, Ph.D., opined:

Sierra will require a lifetime of therapeutic intervention and support. Similarly, because of the foreseeable, ongoing mental health concerns, with the continuing cloud of internet criminal activity that chronically victimizes her, there will need to be periodic psychological and vocational re-evaluations to assess her evolving status and needs that will possibly change over time and circumstances.

(Doc. # 58-1 at 28.)

[3] Sierra and the Government contend—and Defendant does not dispute—that the $70,000 figure Dr. Cooper provided for "general health care" refers to those general health care costs attributable to medical conditions caused by abuse and trauma due to the manufacturing, distribution, and viewing of pornographic images of Sierra.

[4] Dr. Cooper estimated the cost of certain medications for several specific medical conditions. For brevity and to protect Sierra's privacy, the court will not list the names of Sierra's medications or medical conditions.

(Doc. # 60-1 at 3.)

In a report dated June 25, 2017, Dr. Randall L. Green, Ph.D., a clinical psychologist, stated that Sierra's "therapy costs have been[ ] and are projected to be substantial, involving continued weekly individual therapy, family therapy, and the possibility of intermittent hospitalizations or residential care." (Doc. # 58-1 at 28.) Dr. Green estimated the cost of that therapy (not including related medical costs for medications that were included in Dr. Cooper's report)[5] at $190,000-$380,000. *See United States v. Osman*, 853 F.3d 1184, 1190 (11th Cir. 2017) (holding, as a matter of first impression, that future therapy expenses are recoverable in child pornography cases).

Dr. Green noted in his report that his cost estimate did not include any "possible hospitalization, since that is difficult to predict," but that, in light of Sierra's medical history and conditions, hospitalization could not be ruled out as a possibility. "If that were factored in, that could add another $20,000 to $60,000 to the estimate for each hospitalization stay." (Doc. # 58-1 at 28.)

At the restitution hearing, Carol Hepburn's undisputed testimony established that, after Dr. Cooper and Dr. Green produced their reports, Sierra underwent seven

---

[5] Dr. Green stated in his report that Dr. Cooper estimated only $351,000.00 in medical costs. (Doc. # 58-1.) As is plain from Dr. Cooper's report, and as established at the restitution hearing, Dr. Green was mistaken in his characterization of Dr. Cooper's estimate.

7

months of inpatient hospitalization that was attributable to harm caused by production and trafficking of images of her. Neither Dr. Cooper nor Dr. Green's estimates specifically include costs for that seven-month inpatient hospitalization. At the hearing, no evidence was given as to the exact cost of the seven-month inpatient hospital stay. In the absence of more specific information regarding the cost of that hospitalization, in light of the Government's burden at the restitution stage, and considering Dr. Green's estimated range of the cost of a future hospitalization, the preponderance of the evidence establishes that the seven-month hospitalization would have cost *at least* $20,000.

The court rejects Defendant's argument that Sierra's medical and therapy expense estimate should be adjusted downward because Sierra has a duty to mitigate future trauma by opting not to receive notices of new prosecutions.[6] As Sierra's attorney testified at the hearing, so long as Sierra intends to seek restitution, her attorney will have to communicate with her about future cases, even if Sierra continues to designate her attorney to receive the notices. Further, at this time, only by sheer speculation could it be said that Sierra would minimize her damages by any specific, appreciable amount by continuing to opt out of receiving the notices. As

---

[6] Because Sierra is a minor, and pursuant to Sierra's guardians' decision, Sierra's attorney is currently accepting those notices on her behalf, although some notices are inadvertently sent to Sierra rather than her attorney. After Sierra attains the age of majority, she may one day decide to revisit the issue and opt to receive the notifications herself.

Sierra's attorney noted, some victims choose to receive the notices because they find that, for them, receiving the notices is more beneficial than harmful. Moreover, "knowledge of the continued viewing, which the notifications bring [Sierra], is precisely the kind of continuing injury that *Paroline* squarely addresses and finds compensable." *DiLeo*, 58 F. Supp. 3d at 243. "All of the losses caused by the trafficking must be attributed to the offenders, and not the victim." *Id.* at 244.

The court also rejects Defendant's argument that it should reduce the estimate of Sierra's total losses based on past unquantified Medicaid payments for health costs and speculation as to the future availability of employer-provided healthcare. As Sierra's attorney noted, Medicaid in Sierra's home state has indicated that it will pursue subrogation and/or a lien on recovery. More to the point, however, the law explicitly prohibits reduction of a restitution award based on the availability of insurance or other third party payments. 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."); 18 U.S.C. § 2259(B)(ii) ("A court may not decline to issue an order under this section because of . . . the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source.").

9

Accordingly, based on the preponderance of the evidence, the court concludes that Sierra's total lifetime medical treatment and therapy due to trafficking in her images are reasonably expected to cost between $871,453 to $1,061,453. *See* 18 U.S.C. § 2259(b)(3)(A) (including "medical services relating to physical, psychiatric, or psychological care" in the costs to be included in the victim's total loss).

2. **Attorney's Fees And Costs**

Based on the evidence and the testimony of Sierra's attorney at the restitution hearing, the court finds that, to date, Sierra's total loss includes $9,822.87 in attorney's fees and costs. This figure includes current and past costs and attorney's fees arising from all the child pornography cases involving her images. This figure does not include any estimate of future attorney's fees and costs.

3. **Physical and Occupational Therapy or Rehabilitation; Necessary Transportation, Temporary Housing, and Child Care Expenses**

Based on the preponderance of the evidence, including Carol Hepburn's testimony and the reports of Dr. Cooper and Dr. Green, the court finds that Sierra will incur some lost wages as a proximate result of production and trafficking in her images. However, because Sierra is a minor, and because she is in relatively early stages of treatment, reliable evidence as to the *amount* of any future lost wages cannot be obtained at this time. Therefore, to avoid engaging in baseless speculation,

the court will not include lost wages in the estimate of Sierra's total damages. *See* 18 U.S.C. § 2259(b)(3)(D) (including "lost income" in the costs to be included in the victim's total loss).

The record contains no evidence regarding Sierra's need, if any, for physical and occupational therapy or rehabilitation, necessary transportation, temporary housing, child care expenses, and any other losses suffered as a proximate result of the offense. *See* 18 U.S.C. § 2259(b)(3)(B)-(C), (F) (including those items in the victim's total losses).

### 4. Conclusion

Accordingly, by a preponderance of the evidence, the court concludes that Sierra's losses that are currently capable of estimation and that are caused by the continuing traffic in her images reasonably fall within the range of $881,275.87 to $1,071,275.87. This estimated range is conservative,[7] and the amount of total loss is likely to be adjusted upward in future cases to account for other losses Sierra has incurred or will incur (such as lost income, additional attorney's fees, and other costs), but that cannot be included in this court's estimate due to lack of available evidence as to the amount of those losses.

---

[7] For example, due to the lack of more specific evidence, this estimate includes only $20,000 for a seven-month hospitalization, which is on the low end of Dr. Green's estimated costs of future inpatient hospitalizations.

B.  **Defendant's Relative Role in Causing Sierra's Total Losses**

Having determined the amount of the Sierra's losses caused by the continuing traffic in her images, the court will now "consider . . . factors that bear on the relative causal significance of [Defendant's] conduct in producing those losses." *Paroline*, 134 S. Ct. 1728.

1.  **The Number of Past Criminal Defendants Found to Have Contributed to Sierra's General Losses**

To date, 44 Defendants have been ordered to pay restitution to Sierra in a combined total amount of $109,849.92. (Doc. # 58-2.) The lowest restitution award was $250.00. The highest award amount was $10,000.00, which was awarded in two different cases. The court declines Defendant's invitation to select a $250.00 restitution amount based on sheer speculation as to the reasons for the restitution amounts awarded with respect to previous defendants. As discussed at the hearing, it is not possible to tell from the information provided which of the previous defendants, if any, engaged in conduct similar to Defendant's, whether the previous restitution amounts were reached by agreement or by court order, or any other information that would allow for a helpful comparison of this case to the previous cases.

To date, Sierra has received approximately $6,667 in restitution payments since the first restitution award was entered in June 2016. At this time, because the vast majority of the previous defendants are likely currently in prison, it is difficult to estimate how much of the previously ordered restitution Sierra will likely recover. Even in the unlikely event that all of the previous orders of restitution are satisfied, Sierra would recover roughly one tenth of her estimated total loss.

2. **Reasonable Predictions of the Number of Future Offenders Likely to Be Caught and Convicted for Crimes Contributing to Sierra's General Losses; Reasonably Reliable Estimate of the Broader Number of Offenders Involved**

The next *Paroline* factors involve (1) a "reasonable prediction" of the number of defendants who will face future prosecution in connection with the trafficking in pornographic images of the victim, and (2) consideration of any available "reasonably reliable" estimate of the total number of offenders who escape detection for trafficking in the victim's images. *Paroline*, 134 S. Ct. at 1728. Defendant points out that there are approximately 1,000 images and 50 videos of Sierra in distribution. However, without more information, those numbers do not provide a reasonable basis for estimating the total number of participants in the trafficking and viewing of each of those images and videos.

"Frankly, other than providing a tabulation for defendants under indictment and investigations underway at any fixed moment, the proffered number would be

the sheerest of speculation." *Dileo*, 58 F. Supp. 3d at 245. As another district court judge has noted:

> In the absence of joint and several liability, which *Paroline* forbids in this context, 134 S.Ct. at 1728–29, such information is essential to any system of restitution which purports to assess an individual offender[']s fair share of the total continuing losses, only a part of which is, by definition, proximately attributable to him. Far from a one case failure of proof by the government, this shortcoming affecting the calculation here seems endemic. Across the board, the government appears unable (and it is easy to see why) to provide "any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted)." *Id*. at 1728. Indeed, it is hard to fathom how, at any given point in time, such estimates and predictions could be more than a wild guess. *See United States v. Reynolds*, No. 12–20843, 2014 WL 4187936, *6 (E.D. Mich. Aug. 22, 2014). All that can be said reliably is that the number of individuals who view these images will increase at some rate in the future. But because any "prediction" or "estimate" of this rate would be sheer speculation, "[t]hese factors ... do not impact the restitution award[ ] in this case," *id*., except to suggest that the [number of convicted] offenders the government advances is less than the number *Paroline* says must be held accountable. A component critical in computing [the defendant's] proportionate restitution obligation—the number of other contributors—therefore, lies unproven except that it is higher than the number of offenders subject to restitution advanced by the government.

*Id*. at 245 (Vitaliano, D.J.).

### 3. Defendant's Offense With Respect to Sierra

*Paroline* next directs the court to focus on the individual defendant's conduct by considering factors such as

> whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of

the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.

134 S. Ct. at 1728.

Defendant was charged with, and pleaded guilty to, one count of receipt of child pornography. Defendant possessed only a single image of Sierra. There is no evidence Defendant distributed the image or participated in the creation of the image. Defendant points out that his image of Sierra was one among 1,000 images and 50 videos in circulation. These numbers, without more, represent "other facts, *id.*, that are of some limited[8] use in reaching a nonspeculative estimation of Defendant's relative contribution to Sierra's loss.

Defendant's conduct is along the lines of the least possible involvement in Sierra's harm that could still be expected to result in criminal charges and to proximately contribute to her losses. Relatively speaking, the conduct of most other offenders will be as bad as, or worse than, Defendant's conduct.

---

[8] These numbers would be of more use in estimating Defendant's relative contribution to Sierra's total loss if, for example, more specific evidence had been presented regarding the relative distribution frequency of Defendant's single image and the relative amount of damage caused by producing. Also useful would be evidence regarding the reprehensibility of the act depicted in the image Defendant possessed, in comparison to the reprehensibility of the acts depicted in the other images. Compared to the other images of Sierra in circulation, Defendant's single image could contribute disproportionately to Sierra's harm if it was produced in a particularly sadistic manner or if it was the main image of Sierra in circulation.

C.  **Restitution Amount in This Case in Light of *Paroline* Factors**

Upon review of controlling authority, as well as restitution cases decided under *Paroline* by other district courts, the court concludes that the approach of United States District Judge Eric N. Vitaliano in *Dileo* and *United States v. Darbasie*, 164 F. Supp. 3d 400 (E.D.N.Y. 2016), represents the most workable and reasonable approach to apportioning shares of a victim's losses in cases similar to this. Judge Vitaliano's approach begins with "a simple division of quantities known at the time of apportionment." *DiLeo*, 58 F. Supp. 3d at 248. Dividing by 45[9] the range of Sierra's total losses ($881,275.87 to $1,071,275.87) yields a proportional share range of $19,583.91 to $23,806.13. The court notes that this proportional share range does not take into account the number of other, future offenders, including those likely to be convicted and subject to restitution awards in the future, which would decrease the proportional shale of the loss. Neither does the proportional share range take into account the proven likelihood that Sierra will incur additional future losses for items such as lost income and additional attorney's fees, which cannot be estimated at this time, but which would increase the proportional share of the loss.

---

[9] Forty-five represents the number of previous defendants against whom restitution was awarded, plus Defendant.

Further, the proportional share range does not take into account the possible need for upward adjustment of Sierra's future medical costs. As Dr. Green noted, while it can be said with certainty that Sierra will require a lifetime of medical care and therapy, she will require "periodic psychological and vocational re-evaluations to assess her evolving needs and status that will possibly change over time and circumstances." (Doc. # 58-1.) The court notes that the projected estimates for medical and therapeutic care have been proven by a preponderance of the evidence to underestimate Sierra's actual costs to date. For example, those estimates did not anticipate Sierra's recent seven-month hospitalization.

Defendant's role in relation to the scope of the manufacturing, trafficking, and viewing of child pornography of Sierra is notably limited: receipt of one image without distribution. However, even Defendant's limited role has contributed to Sierra's total losses, including extensive psychological and physical harm that will require lifetime treatment. The court is mindful that, under *Paroline*, the final restitution awarded with respect to any particular defendant should not be "trivial," considering all relevant facts and the victim's total loss. *See Paroline*, 134 S. Ct. at 1728 ("These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders."); *see also id.* at 1727 (explaining that taking a particular defendant's relative role into account would not result in a "token or nominal" restitution award).

Accordingly, considering all relevant factors and the preponderance of the evidence, the court concludes that the lowest end of the proportional share range represents a non-trivial restitution award that is reasonably proportional to Defendant's "role in the causal process underlying" Sierra's losses. *Id*. at 1727. An award of approximately one-tenth of the lowest end of the average proportional share range is not overly excessive, but is adequate but to "serve the twin goals of helping [Sierra] achieve eventual restitution for all her child-pornography losses and impressing upon offenders the fact that child-pornography crimes, even simple possession, affect real victims." *Id.*

Therefore, Defendant shall pay Sierra restitution in the amount of $2,000.00.

### III. CONCLUSION

Accordingly, it is ORDERED that Defendant Keith Channing Reddick shall pay restitution as follows:

1. $1,500.00 to "8 Kids – John Doe 4;"

2. $1,500.00 to "Sweet Sugar – Ava;" and

3. $2,000.00 to "Jan_Socks Sierra."

Further, it is ORDERED that, **on or before January 26, 2018,** the Government shall file a notice certifying that it has served a copy of this Order on counsel for "8 Kids – John Doe 4," "Sweet Sugar – Ava," and "Jan_Socks Sierra."

An amended judgment ordering restitution will be entered separately.

DONE this 16th day of January, 2018.

                        /s/ W. Keith Watkins
              CHIEF UNITED STATES DISTRICT JUDGE